389 So.2d 741 (1980)
Shirley McNAMARA, Secretary, Department of Revenue and Taxation, State of Louisiana, Plaintiff-Appellant,
v.
U. O. P., INC., Defendant-Appellee.
No. 14267.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1980.
Rehearing Denied October 30, 1980.
*743 Raymond L. Simmons, Baton Rouge, for plaintiff-appellant.
Blanchard, Walker, O'Quin & Roberts by J. Edgerton Pierson, Jr. and William Paul Lawrence, II, Shreveport, for defendant-appellee.
Before HALL, MARVIN and FRED W. JONES, JJ.
En Banc. Rehearing Denied October 30, 1980.
*744 MARVIN, Judge.
In this appeal we determine what sales and use taxes, if any, are owed the State for several million dollars worth of precious metals which are combined with other materials by a manufacturer in Louisiana to create catalysts that are used worldwide by petroleum refineries to produce high octane fuel. L.R.S. 47:301 et seq.
The refining process, known as catalytic reforming, is licensed to refiners by UOP under the name of plat forming. Platinum is the primary and most expensive of the metals which are combined with an aluminum oxide base to create catalysts. Some catalysts also contain either or both the less expensive precious metals, rhenium and octenite. Octenite is a trade or code name for a metal or metallic compound, the composition of which is a trade secret.
Platinum comprises only about 1/20 of the catalyst but costs from 7 to 20 times more than the other materials in the catalyst. Rhenium and octenite are much less expensive metals and when used in the catalysts, their cost is approximately equal to the cost of the other material, excluding platinum. Platinum producers sold a troy ounce of platinum for about $22 in 1958 and for about $380 in November 1979. At all times the spot market price was from 10 to 40 percent higher. The period during which the State audited the defendant manufacturer, UOP, was 1972 through 1974. The average cost of platinum during the three-year period was $148 per ounce. For clarity, we discuss the circumstances as if platinum were the only precious metal contained in the catalysts.
The catalyst is not consumed in the refining process, but loses its effectiveness in about three years. Spent catalyst is returned by the refiner to the manufacturer in Louisiana where about 99 percent of the platinum is recovered. UOP charges a per-pound recovery charge to its customers. The recovered platinum is then combined with new material and is made into fresh catalyst.
When the price of platinum was stable and relatively low, UOP owned more than 100,000 troy ounces which it used as any other raw material. The price of the catalyst charged the customer included the platinum in the catalyst. When the price of platinum soared in the 1960s, UOP succeeded in shifting the market risk of the platinum to each of its customers who became contractually obligated either to supply to UOP, or to authorize UOP to purchase for the customer's credit, the precious metal needed to produce catalyst to supply that customer's demand. UOP purchases platinum from producers for the account of each of its customers. A customer may direct UOP to sell platinum credited to that customer's account. The customer pays UOP a $1.50 per ounce service charge when UOP sells or purchases platinum for that customer.
UOP maintains extensive records which project the demand for its catalyst. Each customer has a stock account which is debited or credited as the circumstances require when new metal is acquired or sold for the customer and when metal is either delivered in fresh catalyst to, or is recovered from spent catalyst returned by, the customer.
If there is a deficit in a customer's platinum stock account, UOP charges a rent or lease charge (called a turnaround charge) to that customer for platinum contained in the catalyst shipped to that customer until such time as that customer fulfills its contractual obligation to supply the precious metal to UOP. The deficit is usually satisfied by the return of spent catalyst to UOP by the customer. Larger UOP customers such as Shell and Texaco usually have a credit in their platinum stock accounts while smaller refiners sometimes have a deficit. The turnaround (rent) charge for the platinum ($4.50 per ounce, raised to $5.50 in 1974) is for 35 days. If the customer's account still shows a deficit after this period, a percentage of the turnaround charge is imposed daily until the customer makes up the deficit either by the return of spent catalyst or by authorizing UOP to purchase for its account, new platinum. If the deficit exists for 90 days, UOP is empowered by the contract to purchase new platinum and to charge the customer.
*745 The number of ounces involved in turnaround charges during the audit period averaged slightly more than 50,000 ounces a year. One percent of this amount (500 ounces a year) is lost in the recovery process. UOP purchases more than 500 ounces of platinum each year because of customer demand and to avoid eventual depletion of the platinum available to UOP for the manufacture of catalysts.
During the audit period, UOP acquired for 44 customers about 91,000 troy ounces of platinum at an average cost of about $150 per ounce ($13,650,000 value). For manufacturing and reprocessing purposes, UOP considers that it "owns" all of the platinum subject to the "drawing rights" of its customers with platinum stock account credit balances. We deduce from this record that UOP received each year of the audit period at its Louisiana plant spent catalyst containing about 120,000 ounces of platinum, about 50,000 ounces of which was credited to UOP's own platinum account. We estimate that approximately 1,200 ounces (one percent) was lost in the recovery process.
Ownership of the platinum is reflected by the accounting records at the UOP home office in Illinois and it is not possible to identify any quantity of platinum as being "owned" by a particular customer until fresh catalyst is labeled for shipment or spent catalyst is received from a customer by UOP. The platinum at UOP's disposal is in Louisiana, in Illinois, and in new platinum stock accounts of suppliers who are primarily located in New Jersey. The great bulk of the platinum at UOP's disposal is physically contained in the fresh or spent catalyst and in chloroplatinic acid which is used to make the catalysts. All UOP platforming catalysts are made and recycled in the Louisiana plant while chloroplatinic acid is made outside Louisiana. A customer's order for catalyst is usually filled in Louisiana and is shipped by rail and other common carrier throughout the world.
In our composite illustration of the several transactions in question, C, the UOP customer, is a refinery outside Louisiana, with a credit balance in its platinum stock account of only 50 ounces. C orders 20,000 lbs. of fresh catalyst and eventually returns 16,000 lbs. of catalyst. C's platinum stock account is adjusted and the deficit is eventually satisfied by UOP purchasing, for C, new platinum. Drum deposit charges, turnaround charges, recovery charges, and a per-ounce service charge on the purchase of new platinum are illustrated in the composite invoice:

1/ 1/73 (Balance in C's platinum stock account:
 50 oz.)
 20,000 lbs. catalyst shipped at
 $3.00 per pound $60,000.00
 Platinum turnaround charge on
 950 oz. at $4.50 4,275.00
 (1,000 oz. platinum, less credit of
 50 oz. in platinum stock acct.)
 Drum charge, 89 at $8.00 each 712.00
2/ 5/73 Return of 16,000 lbs. spent catalyst
 (containing 800 oz. platinum)
 Recovery charge, $.95 per pound
 of catalyst $15,200.00
 C's platinum stock account credited
 with 792 oz. platinum recovered
 (1% shrinkage in recovery).
 (Deficit in account redued to 158
 oz.)
 Credit for 71 drums returned at
 $8.00 per drum (568.00)
2/15/73 Purchase by UOP for C of 500
 oz. platinum at $150 per ounce $75,000.00
 $1.50 per ounce service charge 750.00
 Platinum stock account credited
 with 500 oz., bringing balance to
 342 oz. credit.
 Daily percentage turnaround
 charge on deficit of 158 oz.
 for 2/5/73 to 2/15/73 (1/100 × 10
 days × $4.50 × 158) 71.10

Under UOP's earlier method of doing business, UOP's Louisiana customer would have owed a sales tax on the price of the catalyst (including the platinum it contained), even though the catalyst was not consumed in the refining process. Under UOP's present method of doing business, UOP's Louisiana customer would be charged by UOP with the sales tax on the price of the catalyst, excluding the value of the platinum contained in the catalyst. The Louisiana customer would then owe a use tax on the cost price of the customer's *746 platinum in the catalyst. This record reflects that a Texaco refinery in Louisiana was treated in this manner by the State taxing authority.[1] UOP suggests this is the correct method of taxing UOP's present way of doing business. The out-of-state customer in many states would owe that customer's resident state a use tax on the cost price of the fresh catalyst installed in a refinery and this price would include the cost of the platinum in the catalyst, according to UOP. Our review of the Louisiana statute and of cases interpreting sales/use tax statutes leads us to generally agree with this concept, subject to these comments.
In Traigle v. P. P. G. Industries, Inc., 332 So.2d 777 (La. 1976), P.P.G. periodically purchased carbon graphite blades which were used as anodes in the electrolytic manufacture of chlorine gas from seawater. The blades, are replaced from time to time as they were consumed in the process, although the carbon element of the blades, except for minute inconsequential traces found as impurities, did not become an integral part of the manufactured gas. The Supreme Court held that the general purpose and the statutory scheme of the Louisiana sales/use tax is to impose the tax upon the ultimate consumer of the particular product purchased. 332 So.2d at 780, 783. P.P.G. was there held to be the ultimate consumer of the graphite blades and responsible for the tax because the blades were used up in the manufacturing process and their carbon content did not become an integral part of the end product. They were not purchased either for the statutory purpose of resale in the form of tangible personal property or for further processing into chlorine. 332 So.2d 782.
The statutory scheme derived in P.P.G. Industries, Inc. is further supported by declarations in the statute:
"It is not the intention of this Chapter to levy a tax upon articles of tangible personal property imported into this state, or produced or manufactured in this state, for export; nor is it the intention of this Chapter to levy a tax on bona fide interstate commerce. It is, however, the intention of this Chapter to levy a tax on the sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state, of tangible personal property after it has come to rest in this state and has become a part of the mass of property in this state." L.R.S. 47:305(5)
"There shall be no sales tax due upon the sale at retail of tangible personal property purchased within Louisiana for use exclusively beyond the territorial limits of Louisiana. If tangible personal property purchased tax free under the provisions of this Section is later brought into Louisiana for use herein the property shall be subject to the Louisiana use tax as of the time it is brought into the state for use herein, subject to the credit provided in R.S. 47:303(A)." L.R.S. 47:305.10
The tax in question is levied by § 302 of the statute in these terms:
"A. There is hereby levied a tax upon the sale at retail, the consumption, distribution. *747 and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein . . .
"(1) At the rate of two per centum (2%) of the sales price of each item or article of tangible personal property when sold at retail in this state; . . .
"(2) At the rate of two per centum (2%) of the cost price of each item or article of tangible personal property when the same is not sold but is used, consumed, distributed, or stored for use or consumption in this state; provided there shall be no duplication of the tax.

"B. There is hereby levied a tax upon the lease or rental within this state of each item or article of tangible personal property, as defined herein . . .
"(1) At the rate of two per centum (2%) of the gross proceeds derived from the lease or rental of tangible personal property, as defined herein, where the lease or rental of such property is an established business, or part of an established business, or the same is incidental or germane to the said business.
"(2) At the rate of two per centum (2%) of the monthly lease or rental price paid by lessee or rentee, or contracted or agreed to be paid by lessee or rentee to the owner of the tangible personal property."
The statute defines many of its terms in § 301, including sale (12), sale at retail (10),[2]dealer (4), lease or rental (7), storage (15), use (18), and use tax (19). What may be a sale by the broad definition of § 301(12) may not be a taxable sale at retail under § 301(10). The regulations promulgated by the State, numbered to correspond with the statute, are also express on this point. See Regulations, Arts. 47:301(9), (10), (11), and (12) of La. Dept. of Revenue and Taxation, June 1, 1979.
The term sale at retail does not include a sale of material which will be further manufactured or processed into an item or an article of tangible personal property intended to be later sold at retail. See L.R.S. 47:301(10).
If an item or an article is not sold at retail in the state, the tax is imposed when the item or article is used, consumed, distributed, or stored for use or consumption within the state. § 302(A). The lease or rental of property and the use of the property by the lessee in the state subjects that transaction to the tax. § 302(B), § 301(7). See also § 305(5), Central Marine Service, Inc. v. Collector of Revenue, 162 So.2d 81 (La.App. 4th Cir. 1964), writ refused.
If property is kept in the state for any use or consumption here, a purpose other than the sale at retail out of state, the cost price (§ 301(3)) is taxable here (§ 302(A)(2)). If a sale of property here is not taxable because it is sold for use or consumption out of state, a later use or consumption of that property in Louisiana will be subject to the use tax. § 305.10.
A sale of raw material which is to become an integral part of a manufactured *748 article that is to be later sold at retail is not subject to the sale or the use tax. The raw material becomes an integral part of the article to be sold at retail, the cost price or sales price of that raw material is theoretically incorporated into the sales price of the article, and the tax will be collected or paid when that article is later sold or used in Louisiana. The tax will be levied not upon the manufacturer, but upon the retail purchaser, user, consumer, as the case may be, of the manufactured item. Conversely, when a thing or a raw material is purchased here or is used or consumed here by a manufacturer in the manufacturing process, and that thing does not become an integral, beneficial part of the manufactured item, the manufacturer is the ultimate retail purchaser, user, consumer, as the case may be, and is obligated to pay the sales or use tax. P. P. G. Industries, Inc., supra.
UOP purchases platinum on the world market for itself or its customers and then only to maintain a supply of raw material for its catalyst manufacturing process. UOP is not engaged in the business of buying or selling platinum at retail. We hold then that no sales tax is owed when UOP purchases platinum under these circumstances
When fresh catalyst is sold at retail to a refinery in Louisiana the sales/use tax should be levied on the transaction.
The customer with a refinery in Louisiana may have refineries elsewhere and may or may not have a credit in its platinum stock account sufficient to cover the catalyst which is shipped by UOP to the Louisiana refinery. If the customer with a refinery in Louisiana has a deficit platinum stock account, the customer pays UOP for the platinum in the catalyst under the lease turnaround provisions of the UOP contract until such time as the deficit is erased by the purchase of platinum on the world market. This transaction is subject to the Louisiana tax. The catalyst has a sales price, excluding platinum, which may be determined. The cost price, and lease price, if applicable, of the platinum may also be determined. UOP is a dealer in the transaction and, as such, is responsible for collection of the tax. Regulations Art. 47:301(4), supra.
When fresh catalyst is sold at retail by UOP to a refinery outside Louisiana, the thing is sold for use outside the state and no sales tax is owed. § 305(5), § 301(10). No lease or rental occurs within this state and no lease/rental tax is owed. § 302(B), § 301(7).
When newly purchased platinum or platinum in spent catalyst is received at the UOP plant in Louisiana, the application of the taxing statute is not as easily resolved. Once the platinum stock accounts are adjusted in accord with the circumstances of the particular transactions, it is not possible to identify who owns what platinum in spent catalyst, in fresh catalyst, or in chloroplatinic acid, at the UOP Louisiana plant. This tangible personal property (platinum) has come to rest in this state and has become a part of the mass of property in this state. § 305(5). It is to be used as a raw material for manufacture into catalyst, some of which is intended for sale and use in this state.
Further compounding the problem is the fact that the catalyst is not consumed either in its use in the refinery or in the manufacturing process at the UOP plant. Platinum is, however, partially consumed or lost (approximately 1%) in the recovery process at the Louisiana plant. The platinum becomes an integral, beneficial part of the manufactured item (catalyst) and is not consumed in the manufacturing process. The recovery process is not integrated with the manufacturing process as we understand the testimony, but is a separate process. To a limited extent, UOP, in the recovery process, is the ultimate consumer of approximately one percent of the platinum. The platinum lost is eventually replaced, usually by UOP purchasing platinum for the account of a customer. We cannot overlook, however, that UOP purchased for itself approximately 500 ounces of platinum each year of the audit period to cover its shrinkage in the *749 50,000 ounces of UOP platinum involved each year in lease turnaround transactions in order to maintain its platinum stock account at 52,000 ounces.
The trial court held that the only platinum subject to the tax was platinum contained in a catalyst shipped to a Gulf refinery in Louisiana in 1972 on which UOP was paid a lease turnaround charge. The trial court's judgment levied the tax on the then cost of that platinum (3,008 ounces at about $60 per ounce, or $180,000).
The State appealed and UOP answered the appeal. The correctness of the judgment, which both litigants assert is in error, and the issues on the contemporaneous construction bar and the liberative prescription of Art. 7, § 16, La.Constn., require our consideration.
The State generally contends that UOP owes a sales or use tax on the platinum that it purchases (presumably for itself or for another) and keeps in Louisiana for rent or lease (State's Issue 1) and on the platinum in its custody in Louisiana which it uses to manufacture catalyst (State's Issue 2).
UOP contends that no sales tax is owed on its sales of catalyst, or on leases of platinum in catalyst, which is used in refineries outside Louisiana, that no use tax is owed by UOP on the "use" of its, or of a customer's, platinum in the manufacturing process, simply because no taxable use occurs here for the reason that all platinum is integrated in the manufacturing process as a raw material into the fresh catalyst. UOP contends that this is an exempted "use under the § 301(10) definition of retail sale and under § 305(5).
"The term `sale at retail' does not include sales of materials for further processing into articles of tangible personal property for sale at retail, nor does it include an isolated or occasional sale of tangible personal property by a person not engaged in such business." L.R.S. 47:301(10), in part.
"It is not the intention of this Chapter to levy a tax upon articles of tangible personal property . . . manufactured in this state, for export ..." L.R.S. 47:305(5) Our emphasis.
The intent of the statute is clearly expressed and its numerous sections are broad enough to accomplish its stated purpose to levy a tax on
the sale at retail,
the use,
the consumption,
the storage for use or consumption,
within this state, of tangible personal property after it has come to rest in this state and has become a part of the mass of property in this state. § 305(5).
Also pertinent is the L.R.S. 47:301(12) definition of sale and its corresponding regulation. The regulation (Art. 47:301(12)) reads in part:
"Whenever the title to or possession of property is exchanged or transferred by one person to another for a consideration, the transaction constitutes a sale for purposes of this act, even though the transfer is made on a conditional basis. The form of consideration is not a material factor. In the case of a person engaged in the business of fabricating materials into tangible personal property, the entire process for completing the finished product, including the fabrication labor, constitutes a sale. Similarly, if a person engaged in the business of fabricating materials into tangible personal property uses materials furnished by the person for whom the work is being performed, the fabrication of the materials is included in the definition of sales.
"If a person prepares, furnishes, or serves tangible personal property which is consumed on his premises, those activities, i. e., the furnishing, the preparation, and the serving constitutes a sale for purposes of this act, whether billed as one item or billed separately. If the property is not consumed on the preparer's premises, preparing or serving is not a part of the `sale' under this act, if and only if, a separate charge is made for the preparation and serving."
Unlike Texas, Louisiana has not exempted the sale or use of catalyst from *750 the tax. We are required to determine legislative intent from the entirety of the statute and to apply it to the circumstances of this case. The aim of all of the principles of statutory construction is to ascertain the legislative intent. A fair and reasonable construction is required and it is only when reasonable doubt arises about the application of the statute that we are required to construe it in favor of the taxpayer. P.P.G. Industries, Inc., supra.
Our consideration of the entirety of the statute leads us to the conclusion reached in P.P.G. Industries. The State intends to tax only the transaction which results in the ultimate use or consumption, or in the storage for ultimate use or consumption, in this state of tangible personal property.
The acquisition of raw material which will be manufactured into an item intended for sale at retail is not a taxable transaction, notwithstanding from whom or by whom the raw material is acquired. Here the raw material is platinum and the item intended for sale at retail is the catalyst.
Some waste or shrinkage occurs when any raw material is manufactured into an item to be sold at retail and we are not concerned in this case with the one percent loss of platinum in the recovery process being a taxable consumption in this state. The ultimate transaction in this case is the sale, use, or lease for use, within this state, of the manufactured catalyst and the platinum which it contains. This is the transaction which the statute is designed to tax. P.P.G. Industries, Inc.
We hold then that when UOP delivers catalyst to a refinery in this state, UOP is obligated as a dealer to collect from the transferee of the catalyst and to pay to the State, the sales, use, or lease tax on the transaction, as this case may be. The basis upon which the tax shall be levied, of course, shall vary as the individual transaction varies under the UOP method of doing business.
The result of the UOP method of doing business, as we understand it, is that at some time a Louisiana refiner will acquire platinum to satisfy its deficit platinum stock account. This acquisition of platinum, as tangible personal property defined by the statute, occurs when the catalyst containing the platinum is shipped to that refinery. Before the platinum deficit is erased, that refinery will be paying, in addition to the sales price of the platinum, a price for the use of the platinum in the catalyst. Whatever the transaction within this state, the Louisiana refiner will owe a tax which can be determined at some time. The total cost to the Louisiana refinery, including recovery and service charges, lease turnaround charges, and the cost price of new platinum, should be considered in determining the total cost of a particular load of catalyst to a Louisiana refinery. The statute is broad enough to allow the total cost of catalyst to the Louisiana refinery to be taxed and to allow for whatever credits might be permitted under the statute. The statute expressly provides that there shall be no duplication of the tax. § 302(A)(2).
Our intended result is that UOP shall be responsible as dealer to collect the tax from its Louisiana customer when the manufactured item (catalyst) is transferred to that customer.

THE CONTEMPORANEOUS CONSTRUCTION BAR
UOP shows that the State has periodically audited the UOP transactions since about 1960 and has not contended until this assessment was levied in 1976, that any taxes were owed by UOP. It has been recognized that an administrative contemporaneous construction for over two decades is indicative of legislative intent and may be given substantial and sometimes decisive weight. See P.P.G. Industries, supra, and cases cited therein. That case, however, squarely held that an administrative contemporaneous construction cannot have weight where such construction is inconsistent with the statute. 332 So.2d *751 782. We consider the square holding authoritative. The intent of the entire statute (chapter) as declared in § 305(5) is not ambiguous and the several sections of the statute, when construed in the light of that declaration, are not ambiguous.

THE PLEA OF LIBERATIVE PRESCRIPTION
UOP's plea of liberative prescription is founded upon the premise that UOP had more than 60,000 oz. of its own platinum involved in turnaround transactions in 1967 (more than three years before the 1972-1974 audit period). UOP argues that any sales or use taxes even on the 3,008 oz. of its platinum allegedly used in Louisiana in the Gulf refinery lease turnaround transaction in 1972 had prescribed because the entirety of its platinum (more than 60,000 oz.) had been in Louisiana and had been used here in the manufacture of catalysts in 1967. This argument is not tenable, however, to a § 302(B) "lease" within this state or to a deferred "sale" that occurs during the audit period. See Collector of Revenue v. F. & H. Equipment Company, 119 So.2d 631 (La.App.2d Cir. 1960).
Accordingly, we find without merit UOP's contentions relating to the liberative prescription and to the contemporaneous construction bar.

CONCLUSION
The trial court was not in error in taxing the platinum involved in the 1972 lease turnaround transaction between UOP and a Gulf refinery in Louisiana. The tax was imposed, however, on the "cost price" of the UOP platinum upon the theory that this constituted a "use" of the platinum by UOP in Louisiana. When the total cost of the catalyst, including the platinum, is determined, that cost may be more or less than the price UOP paid for that platinum. We will therefore reverse the judgment of the trial court to allow the tax to be levied on whatever the total cost of the catalyst was to Gulf.
We reverse the judgment of the trial court and remand for further proceedings for the taking of further evidence to allow the trial court to determine what taxes are owed for the audit period in accord with this opinion. Costs are assessed one-half to each litigant.
REVERSED AND REMANDED.
HALL, Judge (concurring).
I concur in the remand of this case for further proceedings.
UOP is in the business of manufacturing and selling catalyst, which is made up of precious metals and other components. All of the transactions involved in this case arise out of written contracts between UOP and its customers for the sale of catalyst.
Regardless of whether UOP buys platinum for its own account or that of a customer, whether the customer pays UOP for the cost of the platinum before or after catalyst is delivered to the customer, whether there is a so-called lease or turnaround charge made, whether the customer returns spent catalyst to UOP, and regardless of the other variables involved in these transactions, there is simply a sale of catalyst, including the precious metals contained therein, for a price which includes the cost of the platinum contained therein and the service charge, if any, made in connection with the acquisition of the platinum. The price also includes the turnaround charge where applicable, this being nothing more than an additional charge made under the circumstances of those sales where the customer complies with its contractual obligation to supply platinum to UOP after delivery of catalyst to it rather than before delivery.
The crediting of a customer's platinum stock account with a certain quantity of platinum and payment by the customer of the cost of the platinum, plus a service charge, does not amount to a sale of tangible personal property in Louisiana. Such transactions are made pursuant to the contract in connection with orders for catalyst, and amount to prepayment for the platinum contained in the load of catalyst ordered. No platinum located in Louisiana *752 can be identified as belonging to a customer until catalyst is delivered to a common carrier at the UOP plant. Contrary to the State's contention, there is no use of platinum by the customer in Louisiana prior to the use of the catalyst at the refinery. Consequently, there is no sales or use tax due by the customer prior to delivery of the catalyst to the customer.
Also contrary to the State's contention, there is no tax due on UOP's use of platinum in Louisiana. All platinum brought into the state by UOP is used in the manufacture of catalyst to be sold at retail, and is exempt under LSA-R.S. 47:301(10). The so-called lease or turnaround transactions are not leases at all, but are sales of catalyst with an additional charge incidental to the sale. Every so-called lease or turnaround transaction results in a sale and transfer of title to the catalyst, including the platinum. There is authority for looking through a transaction labeled as a lease and determining that it is in fact a sale for sales tax purposes. See Lee Const. Co. v. L. M. Ray Const. Corp., 219 La. 246, 52 So.2d 841 (1951) and Collector of Revenue v. F & H Equipment Company, 119 So.2d 631 (La. App.2d Cir. 1960). It follows that no platinum is held in Louisiana by UOP for lease to customers so as to subject UOP to a use tax.
All sales of catalyst shipped out of state are exempt from sales tax since the sales are in interstate commerce. LSA-R.S. 47:305(5).
All sales of catalyst shipped to refineries in Louisiana are subject to sales tax. The sales price includes the price of the catalyst as shown on UOP's invoice (which does not include the value or cost of the platinum), plus the cost price of the platinum, plus the turnaround charges if applicable, and plus any other taxable charges, less any deductions or credits which are applicable under the statute and regulations.
The record does not identify the sales of catalyst to Louisiana refineries or the price figures necessary to calculate the tax due thereon. Accordingly, I concur in the remand of the case for the taking of such additional evidence as is necessary and for the determination of the tax due by the trial court.
NOTES
[1] Texaco, with a credit balance in its UOP platinum stock account, would pay sales taxes on the price of the catalyst, excluding the platinum. Texaco then would be using at its Louisiana refinery its own platinum in the catalyst and would owe a use tax on the cost price of the platinum. The term cost price in § 302(A)(2) is defined in § 301(3). This situation is to be distinguished from the lease turnaround transaction where the refinery owns no platinum and where the tax is imposed on the rental price or gross proceeds derived from the rental of property. § 302(B). These terms are not defined in § 301.

In a lease situation, the ultimate taxpayer is the lessee who uses within this state the thing leased. As we later observe, this taxpayer should have the benefit of paying the lower amount of tax [e. g. rental price (§ 302(B)) vs. the cost price (§ 302(A)(2))] notwithstanding that this taxpayer uses the platinum at its refinery.
Texas resolves the problem simply by exempting catalysts from the sales/use taxing statute of that state. Tex.Tax.-Gen.Ann. Art. 20.04(E)(1)(b). Louisiana does not exempt catalysts, but exempts drilling equipment used for oil exploitation within the state and casing, drill pipe and tubing sold in Louisiana for use offshore beyond the territorial limits of the state, for the production of minerals. See § 305.1(C), § 305.4.
[2] § 301(12) provides:

"`Sale' means any transfer of title or possession, or both, exchange, barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property, for a consideration, and includes the fabrication of tangible personal property for consumers who furnish, either directly or indirectly, the materials used in fabrication work, and the furnishing, preparing or serving, for a consideration, of any tangible personal property, consumed on the premises of the person furnishing, preparing or serving such tangible personal property. A transaction whereby the possession of property is transferred but the seller retains title as security for the payment of the price shall be deemed a sale."
§ 301(10) provides:
"`Retail sale', or `sale at retail,' means a sale to a consumer or to any other person for any purpose other than for resale in the form of tangible personal property, and shall mean and include all such transactions as the collector, upon investigation, finds to be in lieu of sales; provided that sales for resale must be made in strict compliance with the rules and regulations...
* * * * * *
"The term `sale at retail' does not include sales of materials for further processing into articles of tangible personal property for sale at retail, nor does it include an isolated or occasional sale of tangible personal property by a person not engaged in such business."