597 So.2d 1172 (1992)
Leon TARVER, Secretary for the Department of Revenue and Taxation, State of Louisiana
v.
ORMET CORPORATION.
No. 91 CA 0361.
Court of Appeal of Louisiana, First Circuit.
April 10, 1992.
*1173 Marlin N. Gusman, Marlon V. Harrison, Baton Rouge, for plaintiff/appellant.
Victor L. Marcello, Donaldsonville, Ernest L. Edwards, Jr., New Orleans, for defendant.
Before LOTTINGER, EDWARDS and GONZALES, JJ.
LOTTINGER, Judge.
The Department of Revenue and Taxation appeals the ruling by the trial court that "Ormet's purchases of caustic soda for use as a raw material in the Bayer Process of manufacturing alumina and aluminum hydroxide are subject to the Raw Material Exclusion contained in La.R.S. 47:301(10)(c)."
We have thoroughly reviewed the record and conclude that the trial judge applied the proper standard of statutory construction to La.R.S. 47:301(10)(c), see Collector of Revenue v. Wells Fargo Leasing Corporation, 393 So.2d 1244 (La.1981) and Higgins, Inc. v. Walker, 129 So.2d 840 (La. App. 1st Cir.1961), cert. denied, June 22, 1961, and that the trial judge correctly determined that the purpose for which caustic soda was purchased by Ormet was as a raw material in the manufacturing of alumina and aluminum hydroxide. The evidence is clear that no other material could be substituted for caustic soda. Further, it is also clear that oxygen from the caustic soda becomes a part of the final product.
We adopt the following excellent written reasons of the trial judge as our own.

REASONS FOR JUDGMENT
"There is before this Court only one real issue in this proceeding. Were Ormet Corporation's purchases of caustic soda for use as a processing chemical (as contended by Department of Revenue and Taxation) or for use as a raw material (as contended by Ormet Corporation)?"
"Louisiana law imposes a tax on tangible personal property that is sold at retail in this state. La.R.S. 47:302(A). The terms "retail sale" and "sale at retail" are denied (sic) [defined] as follows:"
`Retail sale', or `sale at retail', means a sale to a consumer or to any other person for any purpose other than for resale in the form of tangible personal property, and shall mean and include all such transactions as the collector, upon investigation, finds to be made in lieu of sales.
"La.R.S. 47:301(10)(a).
"Expressly excluded from taxation are all sales of materials that are purchased for further processing into articles of tangible personal property for sale at retail. This exclusion, known as the "Raw Material Exclusion," provides:"
The term `sale at retail' does not include sales of materials for further processing into articles of tangible personal property for sale at retail, nor does it include an isolated or occasional sale of tangible personal property by a person not engaged in such business.
"La.R.S. 47:301(10)(c).
"From 1961 to 1972, plaintiff's regulations interpreting the "Raw Material Exclusion" provided:"
Article 2-36. Wholesale Sales.
The following wholesale sales are not subject to tax ... (2) Sales of tangible personal property or products to a manufacturer, or compounder, which enter into and become ingredients or component parts of tangible personal property for resale, are sales for processing and are not taxable.
Article 2-37. Sales to Manufacturers and Producers.
The gross receipts or gross proceeds derived from sales of raw materials to manufacturers and producers to be used in fabricating or producing finished articles of tangible personal property for resale, and which become a recognizable, integral part of such finished articles, are not subject to the tax imposed under the Sales Tax Act.
"Articles 2-36 and 2-37 of the Rules and Regulations for Administration of Louisiana General Sales Tax (1961)."
"In 1972, plaintiff promulgated a new regulation interpreting the "Raw Material Exclusion," which regulation superseded *1174 Articles 2-36 and 2-37 and which provides:"
Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves, are further processed into tangible personal property. Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product. Although any particular material may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component [sic] which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive, or for any other reason, if it does not benefit the property by its presence, it was not `material for further processing' and the sale is not exempt under this provision.
"Rule 4301(10) of the Louisiana Sales Tax Law and Regulations (1972) (emphasis added). This regulation is still in effect. See Rule 4301(10) of the Louisiana Sales Tax Law and Regulations (1988)."
"In Marmac Corp. v. McNamara, 546 So.2d 585 (La.App. 1st Cir.1989), the court held that any ambiguity in La.R.S. 47:301 and/or in plaintiff's regulations attendant to that statute must be construed in favor of the taxpayer and against plaintiff. The court stated:"
In addition, we find that the regulations attendant to LSA-R.S. 47:301 are ambiguous. Any ambiguity in an original taxing statute must be construed in favor of the taxpayer, and not the Department of Revenue and Taxation. St. Charles Parish School Board v. Louisiana Power & Light Co., 465 So.2d 93 (La.App. 5th Cir.), writ denied, 466 So.2d 1302 (La. 1985); United Gas Corporation v. Fontenot, 241 La. 564, 129 So.2d 776 (1961). Since the statute in question on this appeal is the original taxing statute and not an exemption, ambiguities must be resolved in favor of Marmac and against the Department of Revenue and Taxation.
"546 So.2d at 588."
"The Raw Material Exclusion contained in La.R.S. 47:301(10)(c) has been discussed by the Louisiana Supreme Court in two separate cases. In the first case, Traigle v. P.P.G. Industries, Inc., 332 So.2d 777 (1976), the court held that the Raw Material Exclusion did not apply to the taxpayer's purchases of graphite blades that were used as catalysts in the manufacturing process of chlorine, because none of the elements of the graphite blades became `a recognizable, integral part' of the end product, although trace amounts of the graphite blades did exist in the end product as an unintended waste residue or impurity. The court held that the test for determining whether a material is subject to the Raw Material Exclusion is whether the material was purchased for the purpose of "further processing into" the finished product, such that the material or any of its elements become `a recognizable, integral part' of the finished product. The court defined `integral' as `essential to completeness: organically joined or linked.' 332 So.2d at 781."
"The second case in which the Louisiana Supreme Court has discussed the Raw Material Exclusion is Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1982). There the court held that Vulcan's purchases of coke for use as a fuel and as a source of carbon in the manufacturing process of `municipal castings' (such as manhole covers) were not subject to the Raw Material Exclusion, even though the coke (which was preheated and mixed with scrap iron in order to melt it) contributed .46 of one percent of the carbon which formed a beneficial part of the finished product. The court reaffirmed its holding in Traigle v. P.P.G. that the test for determining whether an item is subject to the Raw Material Exclusion is whether an item was purchased *1175 for the purpose of "further processing into" the finished product. The court held that Vulcan's purchases of coke were not subject to the Raw Material Exclusion, because Vulcan purchased the coke "for the purpose of heating scrap iron" (a raw material used in the process of manufacturing municipal castings), rather than for the purpose of `further processing into' the municipal castings. The court noted that Vulcan's own general manager testified that Vulcan purchased the coke because `coke is a very efficient fuel' for melting scrap iron. Vulcan's manager also testified that `the addition of carbon (from the coke to the iron used to manufacture the municipal castings) was a secondary benefit.'"
"Significantly, the court found that Vulcan could have manufactured its end products without using coke, either as a fuel or as a carbon source, and that Vulcan could have added carbon to its end products by using "carbon brickettes". The court concluded by stating:"
It is clear from the evidence in this case that coke is purchased for the purpose of heating the scrap iron; the small amount of carbon in the finished product is incidental. The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought. Accordingly, we conclude that Vulcan's purchase of coke is as a "consumer" for a "purpose other than for resale," that is, for its use as a heat source to melt scrap iron and not for further processing into an article of tangible property for sale at retail.
"414 So.2d at 1199 (emphasis supplied by the court)."
"It is this court's considered opinion that the evidence introduced at trial of this action clearly proved that Ormet's purchases of caustic soda are subject to the Raw Material Exclusion, because the caustic soda is purchased and utilized by Ormet for the purpose of "further processing into" alumina and aluminum hydroxide, which are tangible personal property for sale at retail. The evidence proved that Ormet has used the Bayer process since 1958 to manufacture its end products, alumina and aluminum hydroxide; that the Bayer Process is a manufacturing process and not a refining process; that bauxite ore and caustic soda are the two primary raw materials used in the Bayer Process; that the Bayer Process is the only economically feasible method of producing commercial quantities of alumina and aluminum hydroxide; that alumina and aluminum hydroxide cannot be manufactured economically without using caustic soda; and that the caustic soda used in the Bayer Process contributes oxygen that becomes a recognizable, beneficial and integral part of Ormet's end products, alumina and aluminum hydroxide. Chemical experiments conducted by Ormet in connection with this litigation proved with certainty that oxygen from the caustic soda forms a recognizable, beneficial and integral part of Ormet's end products, alumina and aluminum hydroxide."
"The presence of the oxygen contributed by the caustic soda was proved to be absolutely intended and not incidental or accidental. It is not, like a fuel, burned off in the manufacturing process. It is not, like a catalyst, merely an aid to processing, without becoming an integral part of the end products. See, McNamara v. U.O.P., Inc., 389 So.2d 741, 748 (La.App.2d Cir.1980). Nor is it used merely to transport materials without becoming a part of the end products. See, McNamara v. Stauffer Chemical Co., 506 So.2d 1252 (La.App. 1st Cir. 1987), writ denied, 512 So.2d 454, 512 So.2d 455 [(La.1987)]. Nor does it become simply an impurity in the end products. See, Traigle v. P.P.G. Industries, supra."
"The evidence proved that, unlike the situation in the case of Vulcan v. McNamara, supra, Ormet purchases the material in question, caustic soda, for the purpose of further processing one of its elements, oxygen, into Ormet's end products. The processing of the oxygen from the caustic soda into Ormet's end products is absolutely intended, is necessary and beneficial to the end products, and is not incidental. Also unlike the situation in Vulcan, the caustic soda Ormet purchases and uses in the Bayer Process cannot be replaced by another material. There is no substitute *1176 for the caustic soda; the oxygen contributed by the caustic soda as an essential, integral part of the alumina and aluminum hydroxide [and] cannot be added or derived from other materials. This is because alumina and aluminum hydroxide do not exist in molecular structure as single molecules; they exist and form only as three dimensional crystal lattices, which in turn cannot exist and will not form without having as an integral part of their makeup oxygen atoms contributed by caustic soda. Oxygen atoms from the caustic soda purchased by Ormet are found in 100% of the three dimensional lattice structures of alumina and aluminum hydroxide, are "joined or linked" with the other essential atoms that are required to form the lattice structures, and are an integral, essential part of each of the lattice structures, such that the lattice structures of alumina and aluminum hydroxide would not exist without the oxygen atoms from the caustic."
"The evidence proved that Ormet's end products, alumina and aluminum hydroxide, are stoichiometric compounds, which means that they are compounds having a definite, fixed proportion of various atoms. The chemical formulas Al2O3 and Al(OH)3 identify the elements contained in alumina and aluminum hydroxide, respectively, and identify also the ratio of atoms of the various elements necessary to produce those compounds. `Al' denotes aluminum, `O' denotes oxygen, and `H' denotes hydrogen. There must always be exactly three atoms of oxygen for every two atoms of aluminum in the product Al2O3 (exclusive of impurities which may be present), and there must always be exactly one atom of aluminum for every three atoms of oxygen and every three atoms of hydrogen in the product Al(OH)3 (exclusive of impurities which may be present), or else the compounds will not be alumina and aluminum hydroxide, respectively. If any of the essential atoms were removed from the alumina or aluminum hydroxide, it would be analogous to removing a support block from the base of a stack of building blocks: the structure would collapse. Thus, even if the percentage of oxygen atoms contained in Ormet's end products that derives directly from the caustic soda were only about 2% of the total number of oxygen atoms in the products (although the evidence showed that the actual percentage varies over time from a theoretical minimum of 2% to a theoretical maximum of 25%), the removal of that 2% would leave the hypothetical compounds Al2O2.94 and Al(OH)2.94 which are unknown, unsalable non-stoichiometric compounds and which would not be alumina or aluminum hydroxide. In other words, the alumina and aluminum hydroxide simply would not form or exist."
"Thus, the evidence clearly proved that Ormet's purchases of caustic soda for use as a raw material in the Bayer Process of manufacturing alumina and aluminum hydroxide are subject to the Raw Material Exclusion contained in La.R.S. 47:301(10)(c)."
Therefore, for the above and forgoing reasons, the judgment of the trial court is affirmed at the costs of the Department of Revenue and Taxation in the amount of $1,075.80.
AFFIRMED.