KNOLL,-J.,
dissents.
hi dissent from the majority’s holding in this case, which opens the door to exempting from sales tax all purchases for consumption where' the purchaser’s process results in 'an incidental by-product that is salvageable or saleable; ' The majority’s conclusion that “only the manufacturing process (and the' physical and chemical components of the materials involved therein) is germane to the ‘purpose test,’ ” unnecessarily forecloses consideration of relevant evidence and is highly likely to invite taxpayer abuse, effecting unintended results which will negatively impact Louisiana’s already-suffering public fisc. To use an extreme example — cow manure and chicken excretions are very good fertilizers. Large cattle and chicken operations could (and probably do) collect the waste and sell it to the fertilizer industry. Under the majority’s policy, the cattle and poultry industries "could qualify for a tax exemption on the purchase of food for their animals’ consumption 1?,under the “further processing exclusion.”
Endless , creative “sales” of residual waste materials or recyclables for the purpose of evading taxes are likely if not inevitable ‘ under the majority’s holding. As one amicus brief pointed out, contractors could escape tax on all of their purchase of materials by selling scrap wood as mulch or particleboard, claiming they really purchased all of their lumber for “the purpose of’ selling mulch and particleboard. Even the tobacco industry could be transformed, as Calcasieu Parish’s brief quipped, if the industry could dream up a way for their customers to sell cigarette ash.
Here, the. lower courts, recognized that the limestone at issue was purchased for use in the manufacturing process of elec- *288 trícity and steam, wherein the use of the limestone in the .process generated an unavoidable -burnt residue, ash, which is a saleable product. I strenuously disagree with the majority’s finding that the Court of Appeal applied a “primary purpose” test in reaching this conclusion. Rather, I find the lower courts correctly applied the law and simply did not believe NISCO’s assertion that it had made the purchases at -issue for the purpose of producing ash at all, even as a “secondary” or “co-product.” This finding, as detailed below, is wellr supported by law, jurisprudence, and the record in this case.
During the relevant periods, NISCO expended in excess of $46 million dollars on sand and limestone, generated approximately $739 million dollars in revenue from electricity sales, and made less than $6.8 million dollars from the sale of ash. NISCO argues it should not be required to pay sales tax on the limestone purchased because, although it clearly needs the limestone to. capture sulfur emissions, NISCO asserts it intentionally purchased limestone for the additioml purpose of manufacturing ash. After a two-day trial'on the merits which included all four suits, the trial. court ruled against NISCO on all claims, stating its reasons for judgment in open court:
| sIt is indisputable that the technology process NISCO employs in its production of steam and electricity requires the use of limestone. And, unavoidably, also produces ash, which it sells — NISCO sells. It is also indisputable that limestone in any form, or its component parts, are not found in the steam and electricity produced. Just because the ash is an incidental byproduct of the process, its production, even in combination with the production of steam and electricity, does not in and of itself permit NISCO to claim the benefit of the further processing tax exclusion of its -purchase of limestone.
The Court of Appeal affirmed, applying the three-pronged test enunciated by this Court in International Paper v. Bridges, 07-1151 (La.1/16/08), 972 So.2d 1121, and finding, as is discussed in greater detail below, “the record does not support NIS-CO’s argument that it purchased the limestone for the purpose , of incorporating it into a co-product, the ash.”[1] Although I agree with the majority’s finding the provision at issue is an exclusion, even applying liberal statutory construction in -favor of NISCO, I find the lower courts properly construed the statute, and concluded NIS-CO’s purchases did not fall under the. exclusion.
This Court first closely examined the “further processing exclusion” in Traigle v. PPG Industries, 332 So.2d 777 (La.1976). Writing for the Court, Justice Tate explained the graphite purchased by a manufacturer could not be regarded as having been purchased for the purpose of processing “into” the finished product, and therefore, the taxpayer could not avoid paying sales taxes. The Court framed the question as:
[T]he precise issue of tax law relates to whether, under a tax definition, the graphite is used by the manufacturer as an ultimate consumer, as in the case of machinery or fuel (for which a sales/use tax is due when purchased by it); or whether, instead, the graphite is processed into the final product, so that the purchase of the latter, as the ultimate *289 consumer, p'ays the tax (not the manufacturer).[2] "■
After reviewing the manufacturers process of chlorine production at length;’’the Court concluded the manufacturer was indeed the ultimate consumer of the .graphite at issue, because, even though “waste carbon dioxides” from the graphite | ¿remained in the final product, this matter constituted “waste materials in the chemical reaction, the purpose of which-was to produce chlorine (not carbon oxides) for sale at retail.”[3] ,
. Similarly, a few years later, this Court in, Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1982), examined whether the plaintiff-taxpayer owed sales tax on coke purchased for use in manufacturing manhole covers and rims. Although, the Court originally found the purchase,exempt under La. R.S. § 47:305(4), which exempts boiler fuels from sales tax,, on rehearing the Court found the exemption inapplicable and proceeded, to the issue of whether the “further processing exclusion” applied. In it's original opinion, after explaining Vulcan’s manufacturing process, the Court noted, “although natural gas or electrical furnaces could be used, Vulcan uses coke in its process, not only because coke is an efficient fuel, but also because coke provides the additional benefit of adding carbon content to' thé finished product.” [4] On rehearing, although ’the Court again noted “the presence of carbon in the final- product is- beneficial to Vulcan,” it emphasized “[T]he proper inquiry, however is the purpose for which the coke is bought.”[5] Thus, the Court held:
It is clear from the evidence in this case that coke is purchased for the purpose of heating the scrap iron; the small amount of carbon in the finished product is incidental. The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought, Accordingly, we conclude that Vulcan’s purchase of coke is as a “consumer” for a “purpose other than for resale,” that is, for its use as. a heat source to melt scrap' iron and not for further processing into an article of tangible property for sale at retail.[6]
Id. at 1199 (emphasis added).
Our decision in International Paper, Inc. v. Bridges, 07-1151 (La.1/6/08), 972 So.2d 1121, contains this Court’s latest examination of the further processing |Bexclusion. In International Paper, the Board of Tax Appeals (“Board”) issued a decision finding certain chemicals purchased for the manufacture of white paper products were'exempt from sales tax; applying the following analysis:
The Secretary’s regulation LAC 61:1:4301(10) and the case law provide that in order -to be “material for further processing” as contemplated by the above statute, the raw materials or then-component molecular parts must meet three criteria: (1) they must be of benefit -to the end product; (2) they must be a recognizable and identifiable of the end product; and (3) they must have been purchased for the purpose of reprocessing into the end product.[7]
Examining the evidence in. light of this test, the Board found the chemicals at *290 issue had been purchased to function as a source of the oxygen needed in the bleaching process for creation of white paper products. The Board found a significant amount of the oxygen from the chemicals was recognizable and identifiable in the resulting bleached pulp. The Board also found the oxygen from the chemicals is beneficial to the bleached pulp. Thus, the Board found the chemicals met all three prongs of the test and qualified for the sales tax exclusion.[8]
The District Court affirmed, finding the Board’s factual determinations were not manifestly erroneous. However, on appeal, the Second Circuit reversed the Board, holding the Board had committed an error of law in omitting a fourth prong of the test required to determine applicability of the “further processing exclusion.”[9] In addition to the three requirements articulated by the Board, the.Court of Appeal held the jurisprudence required “the primary purpose for the purchase of the material must to be to process into the end product.”[10] Applying this additional prong to the facts, the Court observed, “Although -the chemical reactions in the process [of bleaching the paper] involve adding oxygen atoms whose origins can be traced to the chemicals or processes in question, the purpose |fiof the- chemicals is to process the lignin in the pulp for paper, not to incorporate raw materials (the chemicals) into the paper product.”[11] Thus, the Court 'of Appeal found sales tax applied to the purchase of the chemicals.
: This Court rejected the Second Circuit’s added prong:
[0]ur review of the applicable law and jurisprudence does not suggest that the raw materials themselves (ie., the exact chemical/physical compositions of the raw materials) must appear in the end products, nor does the law suggest that the primary purpose for the purchase of these raw materials must be their incorporation into the end products.[12]
Recognizing the “further processing exclusion” had been explained by LDR via an administrative rule[13] and examining this rule in light of Legislative- intent, this Court pronounced:
From this rule, wé recognize that raw materials “further processed” into end products are excluded from the sales and use tax provisions when: (1) the raw materials become recognizable and identifiable components of the end products; (2) the raw materials are beneficial to the énd products; and (3) the raw materials are materials for further processing, and as such, are purchased with the purpose of inclusión in the end products.[14]
Having found the Board applied the .correct legal standard, this Court in International Paper held the Board’s factual findings were not manifestly erroneous, noting “the record .contains testimonial evidence suggesting that the presence of the oxygen with the final products- was not only beneficial to fhese products, but necessary for their production.”[15]
*291 I find International Paper presents, no legal obstacles for the lower courts’ analysis and factual findings in this- case, Importantly, this Court in International Paper declined to overrule its prior holding in Vulcan, where we had previously found a material was purchased for the purpose of consumption even though the end product contained a small but beneficial amount of a component of the raw 17material at issue. Instead the Court in International Paper noted the purchasé of coke at issue in Vulcan was made for a purpose (i.e., heat to melt scrap iron) other than inclusion in the final product, relying on the lower courts’ factual findings the admittedly identifiable-beneficial “presence of the carbon (a component of the coke)” in the final product was “merely incidental to the manufacturing process.”[16] Likewise, <in International Paper, we gave great deference to the Board’s factual finding that the chemicals were purchased for the purpose of reprocessing into the paper products at issue. Although the Court upheld as not manifestly erroneous the Board’s Sliding the chemicals at issue had been purchased for a dual purpose, this result- does not foreclose future findings, such as those of the lower courts in this case, that the presence of a material in the. end product is merely incidental rather than purposeful in any given instance. <
Critically, neither International Paper nor other previous case law addressed the novel situation before us, where an inevitable by-product of the manufacturer’s process is itself saleable. . In Traigle, it was undisputed the graphite was purchased for the purpose of producing chlorine — the only question was whether the 'taxpayer was the ultimate consumer of the graphite or whether the graphite was purchased for further processing into the chlorine., In Vulcan, it was undisputed the coke was purchased for , the purpose of producing manhole covers and rims — the only question was whether the taxpayer purchased the coke to consume it in the manufacturing process or whether the coke was purchased for further processing and incorporation into the manhole covers and rims. In International Paper, it was undisputed the chemicals at issue were purchased for the purpose of manufacturing white paper products, and the issue was whether chemicals were purchased-in order to be consumed in the manufacturing process or to be further processed into those white paper products. In contrast, here, the lower courts found |s(l) the limestone was purchased by NISCO for the purpose of generating electricity and steam and (2) the ash was-not an intentionally made product, but merely incidental to the purpose for which the limestone was purchased.
The majority cites LDR’s regulation in support of its finding the “further processing exclusion” applies in this case. The relevant provision, found in a section titled “Uniform State and Local Sales Tax Definitions,” under the heading “Retail Sale or Sale at Retail,” states in. pertinent part:
b.- While specific exclusions are provided in R.S. 47:301(10) with respect to sales of materials for further processing into articles for. resale and with respect to casual, isolated, or occasional sales, and exemptions are provided for ■ sales ■ of. particular items or classes of property by R.S. 47:305 and R.S. 47:305.1 through R.S. 47:305.52, the intent of the law is to classify every sale made to the final user or consumer for any imaginable purpose, other than for resale, as a retail sale or a sale at retail. For purposes of R.S. 47:301(10), whether a transaction is exempt from taxation by statute, jurispru *292 dence, or by constitution has no bearing on classification of the transaction,'
d. Sales of materials for further processing into articles of tangible personal property ■ for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal prop.-erty is produced, but only those materials which themselves are further processed into tangible personal property, - Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product. Although any particular materials may be fully used, consumed, .absorbed, dissipated or otherwise eom-pletely disappear during processing, if it does not become a recognizable and identifiable component which, is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, [sic] it was not material for further processing and the sale is not exempt under this provision.[17]
The majority relies on the above-italicized sentence for the proposition this Court may only look to the contents of the end product — ie., the ash — to determine whether the “limestone”-was further processed. However, this interpretation would require the reader to begin with the assumption that every conceivable saleable InProduct was itself purposefully produced “for subsequent sale at retail.” I find the italicized sentence in the regulation above clearly provides guidance for situations, such as were 'presented in previous case law, where a ráw material was undisputedly purchased for a “processing activity” to produce the “end product” “for subsequent sale at retail,” and the operative inquiry is whether the material was used up in thé processing activity or became a recognizable, beneficial component of the intentionally-created end product. This case, however, presents the operative question of whether the “end product” itself, ie., ash, was even produced for the purpose of “subsequent sale at retail” at all. The characterization of ash as a by-product, while not determinative on its own, is. not a distraction, as the majority insists, but is relevant to whether the manufacturer purchased the items at issue for the purpose of processing them for subsequent salé at retail or, as the lower courts found- here, for the purpose of consumption.
Having found the lower courts applied the correct legal standard, I additipnally note that my review of the record indicates the District Court’s finding the production of ash was not purposeful but merely incidental to the generation of electricity and steam is well-supported by the record evidence. For example,- the Tax Collectors introduced into .evidence an email in which NISCO’s business manager Sandi Boyles wrote: - '
Sand is utilized in the NISCO process for injection into the' circulating fluidized bed boiler along with petroleum coke and limestone for the purpose of producing electricity for sale.[18]
Furthermore, the record contains the following testimony of Ms. Boyles:
*293 Q: Would you purchase limestone to manufacture and sell ash if you didn’t ■ have the electricity to sell?
A: That’s not our business.
Q: Okay, I understand that. I understand that’s not your business. My question to you is: Would you or anybody construct a facility to 'purchase limestone for the sole purpose of producing ash and reselling 110ash?
A: No.
.At another point, Ms. Boyles participated in the following exchange:
Q: Let’s assume that you can no longer get anybody to pay you for the ash, okay, but they’re willing to come and pick it up for free. So that basically the ash is taken off your hands, you don’t pay anything, but you don’t receive any revenue from it. You understand?
A: Yes.
Q: But you still need to generate electricity and generate that, roughly, 195 million dollars a year in revenue you’re getting from electricity. Would you still buy the limestone?
A: More than likely, yes.
In a different email, Ms. Boyles wrote she “decided not to cover the ash analysis m the meeting on Thursday with the entire management team. Instead, t have attached the presentation for your review. ... Please let me know if you have any questions or need further clarification.” The attached presentation reviewed options for economical transfer of ash,.including resale and disposal in a landfill. Slide one of the presentation described the types of ash generated at NISCO:
• Two types of ash: FLY and BED
• Fly Ash — fine residue removed from , stack glasses using various types of air quality control equipment. The residue that remains after, petcoke is burned consists primarily of lime, calcium carbonate and calcium sulfate. Because of the high lime content, when hydrated,, has a self-cementing effect. , ..
• Bed Ash — coarse, solid matter that sinks to the bottom' of the fluidized bed combustion chamber and is periodically removed. Similar, chemical composition to fly ash, but its form ranges from fine sand to small aggregate.[19]
• The value Of ash varies significantly among power plants depending on product quality, the plant’s proximity to the market and product availability.
Slide two discussed the variability-in valuation of ash:
• A new power plant in Alexandria, LA is starting up in June 1^2009 and is considering selling its ash for only $2-$3/ton.

• Other power plants are paying ash companies to take their ash bedause it’s cheaper than putting it in a landfíll.[

20

]

The remainder of the presentation explained the considerable costs of using a landfill as well as the prospects of a different potential buyer for the ash. This sli-deshow demonstrated power plants not only do not generally produce ash intentionally but also will sell ash for a nominal price or even pay companies to take the ash residue from the process “because it!s cheaper than putting it in a landfíll”
Furthermore, the parties to the Partnership Agreement which formed NISCO agreed the ash would not be considered revenue but would generally be treated as a recoupment of costs of electricity produc *294 tion. Indeed, NISCO’s facilities produced no ash in the first four years of NISCO’s existence. NISCO’s own expert witness testified:
Q: And you agree with me, do you not, Dr. Scott, that ash is not the driver in this production process? It’s- the electricity that’s the driver of this production process in NISCO’s decisions, correct?
A: That’s exactly-right.
The record indicates the vast majority of the value of the limestone is used up in its role of absorbing the sulfur emissions generated by burning of the petcoke. In testimony, LA Ash’s President and CEO, Gary Livengood, stated NISCO does not use the ash or collect sales tax when it sells it to LA Ash. LA Ash re-sells the ash to government entities for construction and other applications and to commercial establishments, some of which sell the ash yet again.
The Tax Collectors’ expert witness, Dr. Daryl Burckel, had been a financial officer for industrial corporations and testified in the area of tax and cost accounting. In his review of NISCO’s voluminous documents, he characterized the ash as an incidental by-product and noted the sale of the ash constituted less than | i2one percent of NIS-CO’s sale of electricity. He testified NIS-CO purchased the limestone for the purpose of controlling sulfur emissions to meet permitting standards. Even though NISCO’s attorney repeatedly asked Dr. Burckel to affirm NISCO had an additional purpose to make and to sell ash, Dr. Burckel answered: “Every one of those businesses are looking for every revenue stream that they can find; cause they can find it doesn’t mean that the purpose for which you buy a product changes. The purpose for that product, and just be-that I keep coming back to, was to inhibit sulfur..., ” '
The Court of Appeal correctly noted this language hearkened back to this Court’s observation in Vulcan:
The fact that using coke as a fuel has a beneficial side effect does not change the ;purpose for which it is bought. Accordingly, we conclude that Vulcan’s purchase of coke is “as a consumer” for a “purpose other than for resale,” that is, for its use as a heat source to melt scrap iron and not for further processing into an article of tangible property for sale at retail.[21]
In short, the District Court simply had to determine whether it believed NISCO’s assertion it was purchasing the limestone for purposes including production of ash or whether it agreed with the Tax Collectors’ argument the ash is an incidental, unavoidable burnt residue rather than a purposefully-produced product. .From the Tax Collectors’ view,. NISCO purchased the limestone to be its ultimate consumer and found a cost-saving mechanism for disposing of by-products leftover from its manufacturing process, i.e., sale of the ash. From the majority’s view, as the Court of Appeal opinion quipped, “[I]t appears, then, that one of the ultimate consumers who finally pays the tax on NISCO’s $46 million purchase of limestone is the neighbor John Doe who buys a sack of ash at Home Depot to put in the hole that he dug in his backyard in preparation of planting his new azalea bush.” Clearly, the lower courts found NISCO’s stated additional purpose for purchasing the limestone to be incredulous, instead finding NISCO the consumer” of the material. I ^¡“ultimate
As to the other two prongs of the three pronged “further processing exclusion” test, it matters not whether the limestone *295 is beneficial to the ash or recognizable or identifiable in the ash, because the limestone was not purchased for the purpose of creating ash, thus clearly failing one of the required prongs. Many mahufac-turing processes result in by-products or residues, which must be eliminated, either through disposal or sale in a secondary market. Resale of such by-products or residues is judicious and. laudable, as it results in less waste in the environment and more cost-savings for the taxpayer. However, it still remains the taxpayer bought its original materials for the purpose of a manufacturing process which merely incidentally includes the unavoidable production of the by-product or residue.
In summary, I find the Third Circuit did not, as the majority insists, covertly insert a “primary purpose” requirement into the “further processing exception.” Rather, the District Court and the appellate court simply did not believe NISCO’s assertion that production of ash was even one of the purposes for which NISCO purchased this limestone. The record evidence amply supports the lower courts’ position. As shown above, NISCO’s corporate witness in its La. C.C.P. art. 1442 testimony testified NISCO would not buy limestone if it did not manufacture electricity, and NIS-CO would still buy the limestone if it could not sell the ash. Put another way, the operative question in this case is “Why lie., for what purpose] does NISCO buy limestone?” Although NISCO artfully insists otherwise, I find the lower courts did not manifestly err in concluding NISCO buys limestone for the purpose of producing steam and electricity or in recognizing ash is merely an incidental by-product of NISCO’s production process, rather than an intentionally produced end product. Thus, I respectfully dissent and would affirm the holdings of the lower courts.

. Bridges v. Nelson Indus. Steam, 14-1250, pp. 8, 18 (La.App. 3 Cir. 6/24/15), 169 So.3d 711, 716, 721.

. Id. at 779.

. Id. at 782 (emphasis added).

. Id. at 1994.

. Id. at 1198.

. Id. at 1999 (emphasis added).

. Board of Tax Appeals' written reasons for Judgment (10/28/2003), p. 2, cited and emphasis added by International Paper, Inc, v. Bridges, 972 So.2d at 1121.

. Id. at 1126.

. International Paper, Inc, v. Bridges, 42,023 (La.App. 2 Cir. 4/4/07); 954 So.2d 321.

. Id. at 11-21, 329-34.

. Id.

. International Paper, Inc, v. Bridges, supra, p. 18, 972 So.2d at 1133.

. LAC 61:1.4301.

. Id. at 19, 1133-34.

.Id. at 21, 1136.

. Id. at 17, 1133,

. LAC 61:I.4301(C) (emphasis added).

. (Emphasis added.)

. (Emphasis added.)

. (Emphasis added.)

. Bridges, 14-1250 at 19, 169 So.3d at 722, quoting Vulcan, 414 So.2d at 1199.